```
               IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY
_____ :
                                :
DEPTFORD TOWNSHIP SCHOOL        :
DISTRICT,                       :
                                :    HON. JEROME B. SIMANDLE
          Plaintiff,            :
                                :    CIVIL NO. 01-0784 (JBS)
                                :
          v.                    :    OPINION
                                :
H.B., individually and by her   :
parents and legal guardians,    :
E.B. and P.B.,                  :
                                :
          Defendants,           :
          Counter-Claimants,    :
          and Third Party       :
          Plaintiffs,           :
_____ :
                                :
_____v.                    :
                                :
RAYMOND L. SHERMAN, in his      :
official capacity as DIRECTOR   :
OF SPECIAL EDUCATION,           :
DEPTFORD TOWNSHIP SCHOOL        :
DISTRICT,                       :
                                :
          Third Party           :
          Defendant.            :
_____ :
```

APPEARANCES:

James Schwerin, Esq.
Frank P. Cavallo, Jr., Esq.
PARKER, McCAY & CRISCUOLO, P.A.
Three Greentree Centre, Suite 401
Route 73 & Greentree Road
P.O. Box 974
Marlton, NJ 08053
     Attorney for Plaintiff Deptford Township School District and
     Third Party Defendant Raymond Sherman

Jamie Epstein, Esq.
1101 Route 70 West
Cherry Hill, NJ 08002
     Attorney for Defendants and Third Party Complainants H.B.,
     E.B. and P.B.

**SIMANDLE**, District Judge:

Plaintiff Deptford Township School District brings this action against Defendants H.B., individually and by her parents and legal guardians, E.B. and P.B., pursuant to 20 U.S.C. § 1415(i)(2) under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, et seq., as an appeal of the final administrative decisions of December 6, 2000, and January 3, 2001, entered by the Honorable John R. Futey, New Jersey Administrative Law Judge.  Presently before the Court are cross-motions for reconsideration of this Court's September 29, 2004 Opinion and Order on the parties' cross-motions for summary judgment with respect to the issue of remedy.  Also before the Court is Plaintiff Deptford Township School District's motion for summary judgment dismissing the counterclaims and third-party complaint brought against it by Defendants.  For the reasons discussed below, this Court grants the motions of the parties for reconsideration in part and denies those motions in part.  In addition, Deptford's motion for summary judgment is granted.

## I.  BACKGROUND

The facts of this case are well-known to the parties.  The facts pertinent to the motions now before the Court are given here.  This case involves Deptford Township School District's ("Deptford" or the "District") Individualized Education Plan ("IEP") for H.B., an autistic child, under the Individuals with

2

Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. The IEP in this matter was drafted in April 1999 for the 1999-2000 school year, covering the period from June 1999 to June 2000, by Janet Ulrich, case manager for the program at Child Development Center ("CDC"), the program in which H.B. was enrolled when she transferred to the district from Voorhees Public Schools on February 22, 1999.  The original IEP was submitted to H.B.'s parents and called for H.B. to spend mornings at CDC, and afternoons at the school district's Pine Acres School in the Pre-School Handicapped ("PSH") class.  H.B.'s parents, unhappy with the IEP offered by the District, unilaterally enrolled H.B. in the Goddard School, a private school, at the start of the summer of 1999.[1]

On August 3, 1999, District Special Services Director Raymond Sherman, on behalf of the Deptford Township Child Study Team, requested a Mediation Conference to resolve the educational placement concerns for H.B.  The parents of H.B. rejected the mediation and instead filed a petition for due process in October

_____

[1] During the summer, H.B. spent five days a week at Goddard for 3 hours a day, then received 4 hours of discrete trial therapy ("DTT") at home after school from Partners in Therapy. In Fall of 1999, H.B. continued her attendance at the Goddard School for 12 hours a week, and received 24 hours a week of DTT at home.  In concise terms, DTT is a one-on-one method of behavioral therapy in which an instructor provides an antecedent (such as showing an object or giving a direction to the child), awaits the child's response, and then provides a reward if the response is appropriate.

1999 with Barbara Gantwerk, Director of the New Jersey Office of
Special Education ("NJOSE"), which was then transferred to the
Office of Administrative Law ("OAL").

The Honorable John R. Futey, Administrative Law Judge
("ALJ"), after holding several days of due process hearings,
found on December 6, 2000, that Deptford had failed to provide
H.B. with a meaningful education by a preponderance of the
credible evidence. (ALJ Decision, 12/6/00, at 34). The ALJ
ordered Deptford to create a full day in-district program in a
regular education class, incorporating applied behavioral
analysis and discrete trial therapy ("DTT") techniques to be
coordinated with the Partners in Therapy program. (Id.)
Additionally, the ALJ ordered Deptford to bear the cost of
reimbursing the B. family for all expenses incurred to date for
providing H.B. with DTT from Partners in Therapy, and any future
costs. (Id.) Until a program could be created, the ALJ ordered
that H.B. was to be permitted to remain at the Goddard School so
long as it remained educationally appropriate, and all services
since her initial enrollment there in the summer of 1999 to her
reintroduction into the Deptford program were to be borne by
Deptford. (Id. at 35) In addition, the ALJ ordered Deptford to
reimburse H.B.'s parents for all transportation costs incurred
during her period of enrollment at Goddard School. (Id.) The
ALJ also ordered Deptford to provide compensatory education in

the areas of speech therapy and occupational therapy to H.B. from
the point of her enrollment at Goddard School and for all times
she was not given such services by the District.  Furthermore,
the ALJ ordered Deptford to reimburse Dr. Edna Barenbaum for the
costs of her independent evaluation of H.B.  The ALJ, however,
denied the request for a comprehensive evaluation for physical
therapy.  Finally, the ALJ ordered H.B.'s parents to submit an
itemized list of these expenses to Deptford and for Deptford to
pay within 30 days of its receipt.  (Id.)  Thereafter, the ALJ
rendered an Order dated January 3, 2001, which required, inter
alia, that Deptford complete a psycho-educational evaluation, a
speech and language evaluation, and an updated occupational
evaluation by Dr. Barenbaum and ordered Deptford to pay the costs
for transportation and all evaluations required on behalf of
H.B., while permitting her to remain at the Goddard School's
Chesterbrook educational facility.  (ALJ Order, 1/3/01.)

        Plaintiff Deptford filed an appeal from the ALJ's decision
of January 3, 2001 in this Court on February 15, 2001.  Although
Deptford's Complaint herein recited that it was an appeal from
the January 3, 2001 decision, Deptford failed to seek a stay of
that decision by the ALJ pending this appeal until May 29, 2001,
which this Court then denied on September 20, 2001, and Deptford
failed to address the underlying ALJ Order of December 6, 2000 at
that time.  Moreover, Deptford failed at that time to file the

administrative record from which it took its appeal.  Meanwhile, on June 15, 2001, the B. family moved out of the Deptford School District.

On September 27, 2001, Plaintiff amended its Complaint to reflect that it was appealing from the ALJ decision of December 6, 2000.  Thereafter, in an Opinion filed November 2, 2001, this Court granted the motion of third-party defendants Barbara Gantwerk, Director of the New Jersey Office of Special Education, and John Farmer, then Attorney General of New Jersey, to enforce the ALJ's decision and also denied Deptford's new motion for a stay of execution of judgment and of its obligation to advance the reimbursement to the providers as ordered by the ALJ, largely due to the delay of prior Deptford counsel to seek a stay of those obligations in a timely manner.  (See Nov. 2, 2001 Opinion at 7-15.)

On December 11, 2001, this Court entered an Order which addressed Plaintiff's motion for reconsideration with respect to the stay it sought of enforcement of the ALJ decision pending that appeal.  This Court granted the stay with respect to compensatory educational services and other services not actually rendered by providers to H.B., but denied it with respect to reimbursement for services actually rendered by providers to H.B. as ordered by the ALJ on December 6, 2000 and January 3, 2001, insofar as those services were rendered through June 1, 2001.

6

The December 11, 2001 Order also denied Defendants' cross-motion
to hold Plaintiff in contempt.  Finally, that Order required
Plaintiff to immediately pay a sum of $88,090.61 to be used to
pay for services already rendered, subject to reallocation
depending upon the determination on the merits of the case.

      In an Opinion issued on February 15, 2002 on Plaintiff's
motion for summary judgment, this Court affirmed the ALJ's Orders
in part and reversed them in part, determining that Deptford
Township had provided a free, appropriate public education
("FAPE") to H.B., but not in the least restrictive environment
("LRE").  (See Feb. 15, 2002 Opinion.)  Deptford then filed a
motion for reconsideration on June 11, 2002.  In an Opinion dated
March 27, 2003, this Court denied Plaintiff's motion for
reconsideration, upholding its determination that Deptford had
not provided H.B. a FAPE in the least restrictive environment.
(See Mar. 27, 2003 Opinion.)

      By Order dated January 27, 2004, this Court bifurcated the
case, splitting the IDEA appeal from the family's remaining
counterclaims pursuant to 42 U.S.C. § 1983[2], and the remedy issue

---

      [2]On August 13, 2001, H.B. filed an amended counterclaim and
third party complaint which included third party claims by H.B.'s
sibling, P.B., who was appealing ALJ Fidler's decision of
December 12, 2000, in a different administrative case.  That
third party complaint was brought against Barbara Gantwerk, in
her official capacity as Director of the New Jersey Office of
Special Education, David Samson, in his official capacity as
Attorney General of New Jersey, and Raymond Sherman, in his
official capacity as Director of Special Education for Deptford

was set down for a final hearing.  Plaintiff filed a motion for
partial summary judgment as to the remedy issue on February 6,
2004 and Defendants filed a cross-motion for summary judgment on
March 4, 2004.  The parties agreed that no further testimony of
witnesses was required and that the remedy issue was ripe for
final determination.  This Court issued its Opinion and Order on
September 29, 2004, which ordered that Plaintiff is entitled to
reimbursement from Defendants in the amount of $52,370.00 and
also that Defendants are entitled to an award of $52,800.00 for
use in providing H.B. with compensatory occupational and speech
therapies.  The parties now seek reconsideration of this Court's
September 29, 2004 Order.

_____

Township School District, alleging that Defendants Gantwerk and
Samson failed to ensure the timeliness of the due process
petition with the Office of Administrative Law, and failed to
enforce or take the necessary legal action against Deptford to
compel compliance with the Administrative Law Judge's decision
once it was rendered.  Causes of action were also alleged against
Defendant Sherman.  (See Third Party Compl.)
      On March 25, 2002, Deptford filed a motion for partial
summary judgment as to the claims raised by P.B. in the Third
Party Complaint.  This Court delivered an oral opinion and Order,
dismissing the third party claims and counterclaims brought by
P.B. without prejudice to P.B.'s right to file his own complaint
in a separate civil action on May 8, 2002.
      Subsequently, on March 29, 2002, State Defendants Gantwerk
and Samson moved to dismiss the third party complaint.  In an
Opinion and Order dated May 24, 2002, this Court granted that
motion, dismissing with prejudice H.B.'s third party federal
claims against these defendants.  H.B.'s state law claims were
dismissed without prejudice to refiling in a court of competent
jurisdiction.  (See May 24, 2002 Opinion.)

8

Moreover, Deptford filed its motion for summary judgment in early December 2004, seeking dismissal of Defendants' counterclaim and third party complaint.  The Court heard oral argument on the motions for reconsideration and summary judgment on January 28, 2005 and February 10, 2005.

## II.  DISCUSSION

A.   Cross-Motions for Reconsideration

    1.   Standard of Review

Local Civil Rule 7.1(i) of the United States District Court, District of New Jersey, governs the instant motion for reconsideration.  The rule requires that the moving party set forth the factual matters or controlling legal authority that it believes this Court overlooked when rendering its initial decision.  L. Civ. R. 7.1(i).  Whether to grant reconsideration is a matter within the district court's discretion, but it should only be granted where such facts or legal authority were indeed presented but overlooked.  DeLong Corp. v. Raymond Int'l, Inc., 622 F.2d 1135, 1140 (3d Cir. 1980), overruled on other grounds by Croker v. Boeing Co., 662 F.2d 975 (3d Cir. 1981); Williams v. Sullivan, 818 F. Supp. 92, 93 (D.N.J. 1993).  The purpose of a motion for reconsideration "is to correct manifest errors of law or to present newly discovered evidence."  Harsco Corp. v. Zlotnick, 779 F.2d 906, 909 (3d Cir. 1985), cert. denied, 476 U.S. 1171 (1986).  A motion for reconsideration is improper when

it is used solely to ask the court to rethink what it has already thought through - rightly or wrongly.  <u>Oritani Savings & Loan Assoc. v. Fidelity & Deposit Co.</u>, 744 F. Supp. 1311, 1314 (D.N.J. 1990)(citing <u>Above the Belt v. Mel Bohannan Roofing, Inc.</u>, 99 F.R.D. 99, 101 (E.D. Va. 1983)), <u>rev'd on other grounds</u>, 989 F.2d 635 (3d Cir. 1993).  Nor is reconsideration warranted when the moving party simply recapitulates the cases and arguments considered by the court prior to rendering its initial decision.  <u>Carteret Sav. Bank v. Shushan</u>, 721 F. Supp. 705, 706-07 (D.N.J. 1989).

   2.   <u>The Merits of the Reconsideration Motions</u>

   In its September 29, 2004 Opinion and Order, this Court determined that Plaintiff Deptford Township School District was entitled to reimbursement from Defendants in the amount of $52,370.00, consisting of $2,525.00 for the cost of Dr. Barenbaum's evaluation, $2,490.00 for the County Acres Nursery, $2,811.00 for the Chesterbrook Academy, and $44,544.00 for discrete trial therapy services.  In addition, the Court determined that Defendants were entitled to an award of $52,800.00 for use in providing H.B. with compensatory occupational and speech therapies which Deptford was supposed to provide but did not.

   In its present motion, Deptford seeks reconsideration of this Court's decision to attribute the sum of $54,800.00 to

10

speech and occupational therapies due H.B.  Defendants have filed a cross-motion for reconsideration with respect to this Court's determination regarding Dr. Barenbaum's evaluations and H.B.'s placements at the County Acres Nursery and Chesterbrook Academy.

With respect to the amount attributed to the speech and occupational therapies due H.B., this Court used the sum of $49,475.00 which was previously attributed to those services in this Court's November 2, 2001 Order and increased the hourly rate from $75/hour to $80/hour to reflect the prevailing current rate for these services.  Deptford contends this calculation is incorrect.  To address this, the Court will now undertake a detailed <u>de novo</u> review of the amount to be attributed to these services.

The parties do not agree as to the number of weeks constituting H.B.'s school year for the 1999-2000 academic year.[3] Deptford takes the position that the appropriate number of weeks is forty-two (42), while Defendants argue that H.B. was on an

_____

[3]Parenthetically, it must be noted that counsel, and presumably their clients, have been able to agree on almost nothing in the entire course of this litigation.  Perhaps because the record was so voluminous, or perhaps because recollections falter, or perhaps because Deptford switched attorneys, repeated disagreements have produced virtually no stipulations regarding pertinent facts.  This has compounded the Court's difficulties in harmonizing the parties' positions with the actual record.  The hearing upon these reconsideration motions was a paradigm for the many hearings in this case, where the Court proposed some simplifying assumptions and concessions that were rejected by both sides.

11

extended academic year consisting of fifty-two (52) weeks.  To
resolve this disagreement, the Court looks to the record evidence
before it.  The 1999-2000 IEP prepared by Deptford for H.B.,
which formed the basis for the administrative due process
hearings and the subsequent appeal before this Court, provided
for a period of fifty-two weeks of instruction, covering the
period from June 1999 through June 2000.  (See IEP, 4/20/99, at
1.)  Moreover, ALJ Futey recognized this in his December 6, 2000
Order, in summarizing the basic undisputed facts.  (ALJ Decision,
12/6/00, at 3 ("an IEP was created for [H.B.] to encompass the
period between June 1999 and June 2000"); id. at 7 ("the district
had offered an extended school year for H.B."); id. at 24 ("the
extended school year program in 1999").)  In addition, ALJ
Futey's Order clearly contemplated a fifty-two week academic
year, as he ruled that H.B.'s parents should be reimbursed for
the cost of educating their daughter at the Goddard School up
through the time of his order, which included the summer months
of 1999.  (Id. at 31.)  Thus, based on the record evidence, this
Court concludes that the appropriate measure of time for the
1999-2000 academic year, as far as H.B. was concerned, was fifty-
two (52) weeks.

The parties are in agreement that Administrative Law Judge
Futey's December 6, 2000 Order provided that H.B. was to receive
compensatory education in the areas of speech therapy and

occupational therapy as follows: six 15-minute small group speech sessions per week; one 15-minute session integrated speech and language instruction daily, amounting to a total of five 15-minute sessions per week; one 30-minute individual occupational therapy session per week; and one 30-minute session of occupational therapy in a classroom setting.  (See IEP, 4/20/99, at 5; ALJ Decision, 12/6/00 at 35.)

The parties are also in agreement that this amount of speech and occupational therapy would have been provided for the period of September 1, 2000 to December 31, 2000.  However, this Court also recognizes that H.B. would likely have been on an extended school year at this time as well, which would have commenced in June of 2000.  The Court thus now finds that H.B. was entitled to these services for the period of June 2000 through August 31, 2000 as well.  During this time period, Defendants placed H.B. in the County Acres Nursery, a placement ALJ Futey never approved. As a result, in its September 29, 2004 decision, this Court ordered that Deptford be reimbursed in the amount of $2,490.00, representing the charges incurred for placing H.B. in this facility.  However, the amount of speech and occupational therapies ordered by Judge Futey should have been supplied by Deptford from June 1, 2000 through December 31, 2000 as well.

No occupational therapy was provided to H.B. between January 1, 2001 and June 15, 2001, the date on which the B. family moved

13

out of the Deptford School District, although speech therapy was
furnished.  While Defendants argue that H.B. should have been
provided with this service based on Judge Futey's December 6,
2000 Order, Deptford points to its January 2001 Occupational
Therapy Evaluation of H.B. prepared by Yvonne Conrad, OTR, who
determined that H.B. did "not demonstrate the need for
occupational therapy intervention at [that] time."  Deptford
argues that because its evaluation determined that H.B. no longer
needed occupational therapy, it is not responsible for the cost
of providing that service to her.  In essence, Deptford
effectively proposed a new IEP for H.B. at this time, one lacking
any form of occupational therapy.  However, the District's act of
proposing a new IEP abrogated the application of the stay put
that was in effect as a result of Judge Futey's December 2000
Order.  Allowing the District to take such unilateral action in
order to avoid providing services it was otherwise obligated to
provide, without first obtaining a stay, would "eviscerate the
very protection Congress sought to provide" through the IDEA.
Board of Educ. of the Pawling Cent. Sch. Dist. v. Schutz, 290
F.3d 476, 484 (2d Cir. 2002).  Until a new IEP is established by
actual agreement between the parents and the school district or
by an administrative decision upholding the proposed program,
which the parents choose not to appeal, or by a court, the stay
put remains in effect.  See Schutz, 290 F.3d at 484.  Thus,

14

although it unilaterally determined that occupational therapy was no longer a necessary component of H.B.'s educational program, the District remained responsible for the cost of providing her with that service through June 15, 2001.

The parties have agreed that it is fair to assume that a private provider, coming to the B.'s home, would bill door-to-door in one hour increments.  The Court also assumes that within a one hour billed visit by a private provider, that provider would perform no more than two fifteen minute sessions of speech therapy.  Under ALJ Futey's Order, H.B. was entitled to a total of eleven 15-minute sessions of speech therapy per week (six 15-minute small group speech sessions plus five 15-minute integrated speech/language therapy sessions) and two 30-minute occupational therapy sessions per week.  Thus, in week one, the private provider would have made five visits for speech therapy and two visits for occupational therapy, resulting in a total of seven visits in week one, billed in hourly increments per visit.  In week two, the private provider would have made six visits for speech therapy and two visits for occupational therapy, resulting in a total of eight visits in week two, billed in hourly increments per visit.  Finally, the parties are willing to accept an hourly billing rate for these services of $80/hour as the prevailing market rate.

Based on the foregoing, this Court finds that Defendants are entitled to the following reimbursement for speech and occupational therapies:

June 1999 - June 2000 (52 weeks)
7 visit weeks: 7 visits x $80/hour x 26 weeks   =   $14,560.00
8 visit weeks: 8 visits x $80/hour x 26 weeks   =   $16,640.00

June 2000 - December 31, 2000 (30 weeks)
7 visit weeks: 7 visits x $80/hour x 15 weeks   =   $ 8,400.00
8 visit weeks: 8 visits x $80/hour x 15 weeks   =   $ 9,600.00

January 1, 2001 - June 15, 2001 (24 weeks)
OT services:   2 visits x $80/hour x 24 weeks   =   $ 3,840.00

                              **Grand Total   =   $53,040.00**

Therefore, upon reconsideration, the amount due to the Defendants has increased by the sum of $240.00, from $52,800.00 previously determined in this Court's Order of September 29, 2004, to the present figure of $53,040.00.

In their responding motion, Defendants seek reconsideration of this Court's Order with respect to Dr. Barenbaum's evaluation as well as this Court's decision regarding H.B.'s placement in Chesterbrook Academy and County Acres.  In its September 29, 2004 Order, this Court held that Deptford was entitled to the return of $2,525.00, representing the fee associated with Dr. Barenbaum's evaluation of H.B.  This conclusion was based on Deptford's representation that the evaluation was billed twice: first for $2,525.00 and later, as a reduced billing of $500.00. Defendants' motion papers were silent on this point.  On reconsideration, however, Defendants point out that ALJ Futey

16

actually ordered two evaluations of H.B., both of which were
determined to be the financial responsibility of Deptford.  (ALJ
Decision, 12/6/00, p. 35 ("It is also ORDERED that the district
shall reimburse Dr. Edna Barenbaum for the costs of her
independent evaluation completed on behalf of the H.B. in this
matter."); ALJ Decision, 1/3/2001, pp. 3-4 ("The District shall
pay for the cost of [Dr. Barenbaum's current and updated psycho-
educational evaluation] as well as all of evaluations required on
behalf of H.B.").)  The initial evaluation was billed at
$2,525.00 and the second, updated evaluation was billed at
$2,100.00, which this Court later reduced to a sum of $500 at the
hearing held on December 11, 2001.  In light of this, the Court
reconsiders its previous Order and concludes that Deptford is not
entitled to the return of $2,525.00, representing the fee
associated with Dr. Barenbaum's evaluation of H.B., as it was
clearly ordered to be its responsibility by ALJ Futey.

Defendants also seek reconsideration of this Court's prior
decision to award reimbursement to Deptford in the amount of
$2,811.00, representing monies paid for the Chesterbrook Academy.
This Court wrote, "As these costs were never ordered by ALJ Futey
to be the responsibility of Deptford, the family did not have any
reasonable reliance in incurring them with the expectation that
they would be reimbursed by Deptford." (Sept. 29, 2004 Opinion,
p. 10.)  The Court was incorrect.  Judge Futey's December 6, 2000

Order indeed stated that Deptford was to assume financial
responsibility for the costs of this educational placement.  (ALJ
Decision 1/3/01, pp. 3-4 ("It is ORDERED that . . . H.B. shall be
permitted to remain at the Goddard School's Chesterbrook
educational facility for as long as it remains educationally
appropriate, all costs for which shall be paid for and borne by
the district in this matter.").)  In light of this, the Court
finds it inappropriate to require H.B.'s family to reimburse
Deptford in the amount of $2,811.00 for the Goddard School
placement.

Finally, this Court ordered that Deptford should be
reimbursed for the costs associated with the County Acres
Nursery, amounting to $2,490.00, as this cost was never ordered
by ALJ Futey.  (Sept. 29, 2004 Opinion at p. 10.)  Defendants
argue that although Judge Futey never identified County Acres by
name, that facility was a component of H.B.'s inclusive
placements.  This Court disagrees.  As Defendants admit, Judge
Futey never ordered that Deptford bear the cost of H.B.'s
attending the County Acres Nursery and therefore, the B. family
had no reasonable reliance in incurring this charge with the
expectation that they would be reimbursed by Deptford.  Moreover,
H.B. attended the County Acres Nursery during the summer of 2000.
The Court, however, has already awarded an appropriate amount to
be paid by Deptford for compensatory speech and occupational

18

therapies during this time.  Allowing the parents to recoup this cost would amount to a double compensation for the same services. The Court therefore denies Defendants' request on reconsideration that they not be required to return this additional sum to Deptford.

To summarize, this Court's final determination with respect to remedy, following reconsideration, is that Plaintiff Deptford is entitled to reimbursement from Defendants in the amount of $47,034.00, consisting of $2,490.00 for the County Acres Nursery and $44,544.00 for discrete trial therapy services.  In addition, Defendants are entitled to an award of $53,040.00 for use in providing H.B. with compensatory occupational and speech therapies.  Therefore, Plaintiff's ordered reimbursement is to be set off against Defendants' award of compensatory educational funds, resulting in a net amount presently owed to Defendants of $6,006.00.

B.   <u>Deptford's Motion for Summary Judgment</u>

Plaintiff Deptford has filed a motion for summary judgment to dismiss Defendants' counterclaim/third party complaint against it.  This counterclaim/third party complaint set forth claims under the IDEA; the Rehabilitation Act of 1973, 29 U.S.C. § 794, <u>et</u> <u>seq.</u>; 42 U.S.C. § 1983; the New Jersey Law Against Discrimination ("NJLAD"), <u>N.J.S.A.</u> 10:5-1, <u>et</u> <u>seq.</u>, and the

Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. §
1232g, et seq.

    1.   <u>Standard of Review</u>

    Summary judgment is appropriate when the materials of record
"show that there is no genuine issue as to any material fact and
that the moving party is entitled to judgment as a matter of
law." Fed. R. Civ. P. 56(c). A dispute is "genuine" if "the
evidence is such that a reasonable jury could return a verdict
for the non-moving party." <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>,
477 U.S. 242, 248 (1986). A fact is "material" only if it might
affect the outcome of the suit under the applicable rule of law.
<u>Id.</u> Disputes over irrelevant or unnecessary facts will not
preclude a grant of summary judgment. <u>Id</u>.

    In deciding whether there is a disputed issue of material
fact, the court must view the evidence in favor of the non-moving
party by extending any reasonable favorable inference to that
party; in other words, "[T]he nonmoving party's evidence 'is to
be believed, and all justifiable inferences are to be drawn in
[that party's] favor.'" <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552
(1999) (quoting <u>Liberty Lobby</u>, 477 U.S. at 255). The threshold
inquiry is whether there are "any genuine factual issues that
properly can be resolved only by a finder of fact because they
may reasonably be resolved in favor of either party." <u>Liberty</u>

Lobby, 477 U.S. at 250; Brewer v. Quaker State Oil Refining
Corp., 72 F.3d 326, 329-30 (3d Cir. 1995) (citation omitted).

The moving party always bears the initial burden of showing
that no genuine issue of material fact exists, regardless of
which party ultimately would have the burden of persuasion at
trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986);
Country Floors v. Partnership of Gepner and Ford, 930 F.2d 1056,
1061-63 (3d Cir. 1991)(reviewing district court's grant of
summary judgment in a trademark action); Lucent Info. Manage. v.
Lucent Tech., 986 F. Supp. 253, 257 (D.N.J. 1997)(granting
summary judgment in favor of telecommunications provider in
trademark action), aff'd, 186 F.3d 311 (3d Cir. 1999); Jalil v.
Avdel Corp., 873 F.2d 701, 706 (3d Cir. 1989), cert. denied, 493
U.S. 1023 (1990).  However, where the nonmoving party bears the
burden of persuasion at trial, as Defendants do upon their
counterclaim in the present case, "the burden on the moving party
may be discharged by 'showing' -- that is, pointing out to the
district court —- that there is an absence of evidence to support
the nonmoving party's case."  Celotex Corp., 477 U.S. at 325.

The non-moving party "may not rest upon the mere allegations
or denials of" its pleading in order to show the existence of a
genuine issue.  Fed. R. Civ. P. 56(e).  Indeed, the non-movant
must do more than rely only "upon bare assertions, conclusory
allegations or suspicions."  Gans v. Mundy, 762 F.2d 338, 341 (3d

21

Cir. 1985), <u>cert</u>. <u>denied</u>, 474 U.S. 1010 (1985) (citation omitted); <u>see</u> <u>Liberty Lobby</u>, 477 U.S. at 249-50.  Thus, if the non-moving party's evidence is a mere scintilla or is "not significantly probative," the court may grant summary judgment. <u>Liberty Lobby</u>, 477 U.S. at 249-50; <u>Country Floors</u>, 930 F.2d at 1061-62.

   2.   <u>Section 1983 Damages Against a Municipal Entity</u>

   In <u>Monell v. Dept. of Social Services</u>, 436 U.S. 658 (1978), the Supreme Court held that local governments may be liable for damages, as well as declaratory and injunctive relief, whenever "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers. Moreover . . . local governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." <u>Id</u>. at 690-91.  However, the Court rejected the idea of government liability based on the doctrine of <u>respondeat superior</u>.  <u>Id</u>. at 691-92.[4]

---

   [4]The doctrine of <u>respondeat</u> <u>superior</u> has also been held an impermissible basis for municipal liability in Rehabilitation Act claims brought under § 1983.  <u>Calloway v. Boro of Glassboro Dept. of Police</u>, 89 F. Supp. 2d 543, 558-59 (D.N.J. 2000).

Under Monell, government liability attaches when the constitutional injury results from the implementation or "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." Id. at 694. In Pembaur v. City of Cincinnati, 475 U.S. 469 (1986), the Supreme Court held that a single decision by an official with policy-making authority in a given area could constitute official policy and thus be attributed to the government itself under certain circumstances. Id. Moreover, where a government's authorized decision maker adopts a particular course of action, the government may be responsible for that policy "whether that action is to be taken only once or to be taken repeatedly." Id. at 481.

Policy is made when a "decisionmaker possess[ing] final authority to establish municipal policy with respect to the action" issues an official proclamation, policy, or edict. Id. A course of conduct is considered to be a "custom" when, though not authorized by law, "such practices of state officials [are] so permanent and well settled" as to virtually constitute law. Monell, 436 U.S. at 690 (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970)).

Whether an official possesses policy-making authority with respect to particular matters is to be determined by state law. City of St. Louis v. Praprotnik, 485 U.S. 112, 124 (1988). In

23

addition, identifying a policy-making official is a question of
law, for the court to decide by reference to state law, not one
of fact to be submitted to a jury.  Id. at 126.  "In looking to
state law, a court must determine which official has final,
unreviewable discretion to make a decision or take an action."
Andrews v. City of Philadelphia, 895 F.2d 1469, 1481 (3d Cir.
1990).

    Deptford argues that damages are not available under 42
U.S.C. § 1983 here because Defendants have failed to establish
action attributable to an official policy.  In contrast,
Defendants argue that Raymond Sherman, Director of Special
Education for the Deptford Township School District, possessed
authority for policy regarding special education.  Under New
Jersey law, a board of education is the repository of the powers
of a school district.  See N.J.S.A. 18A:11-1, et seq.  Special
education services are governed by N.J.S.A. 18A:46-1, et seq.,
and are within the powers and responsibilities of the school
board.  Nowhere is the power to oversee compliance with the IDEA
or any other law delegated to a director of special education.

    Defendants argue that Mr. Sherman testified at his
deposition that his powers included the authority to make policy
regarding special education:

> Q.    Did you approve the District.  Strike
>       that.  Did you have authority at the
>       District to approve or disapprove
>       complying with Judge Futey's Order?
>
> A.    Say that again.
>
> Q.    You as Director of Special Ed services
>       do you have authority to um approve or
>       disapprove the District complying with
>       Judge Futey's Order?
>
> A.    Yes.
>
> Q.    Okay and where do you get that authority
>       from?  Is it.
>
> A.    The authority is implied with my
>       position with the District.
>
> Q.    Okay so you have the authority to have,
>       to have the District not comply or
>       comply with Judge Futey's Order is that
>       your testimony?
>
> A.    Yes.

(Deposition of Raymond Sherman, 53:17-54:2.)  This deposition

testimony, however, appears only to provide support for what

Sherman believed his authority to include, not any evidence of

actual delegation of such power to him by the Deptford Board.

Having established that Mr. Sherman can not fairly be said

to be a policymaker for purposes of § 1983 municipal liability[5],

---

[5]Sherman is sued only in his official capacity.  Naming a
government official in his official capacity is the equivalent of
naming the government entity itself as the defendant, and
requires the plaintiff to make out Monell-type proof of an
official policy or custom as the cause of the constitutional
violation.  Monell, 436 U.S. at 690.  Defendants' failure to
establish that action was taken pursuant to a policy defeats the
claims against Sherman as well.

the Court considers whether the District can still be liable if
the Board of Education or possibly the Superintendent of Schools
is properly deemed the policymaker.  Under this scenario, Sherman
is but a subordinate to the official policymaker.  For a
subordinate's decision to be attributable to the government
entity, "the authorized policymakers [must] approve [the]
decision and the basis for it. . . . Simply going along with
discretionary decisions made by one's subordinates . . . is not a
delegation to them of authority to make policy."  Praprotnik, 485
U.S. at 129-30.  Defendants have offered no evidence to support
the position that Deptford approved any decision Sherman may have
made to disregard Judge Futey's Order.  Thus, a finding of
municipal liability would be inappropriate here and a claim for
damages cannot lie.

Defendants maintain that Deptford had a policy of disobeying
the promises of the IDEA and places primary reliance upon the
United States District Court for the Eastern District of
Pennsylvania's holding in Reid v. School District of
Philadelphia, 2004 WL 1926324 (E.D. Pa. Aug. 27, 2004) to support
their argument of municipal liability.  In Reid, the district
court held that the Philadelphia School District had a policy of
implementing the provisions of the IDEA.  Id. at *3.  The court
further determined that the district's treatment of the child in
question amounted to a policy in that it violated the school

26

district's policy of complying with the IDEA.  <u>Id</u>.  This Court
disagrees that compliance with the IDEA, an act of Congress which
requires states accepting federal funding for the education of
disabled children to insure that those children receive a "free
and appropriate education," can be deemed an official policy for
these purposes.  Only a policy that amounts to disregarding the
requirements of the IDEA could be actionable under 42 U.S.C. §
1983.  Moreover, Defendants have offered nothing here to suggest
that Deptford has undertaken a policy of failing to comply with
the requirements of the IDEA.  Evidence of such a policy, not
just mere allegations arising from this anecdote, is required.
Thus, this Court finds Defendants argument unpersuasive and
grants summary judgment in favor of Deptford as to the issue of
municipal liability for all claims brought under 42 U.S.C. §
1983.

    3.  <u>Violation of the Rehabilitation Act</u>

    As part of their counterclaim and third party complaint,
Defendants allege substantive violations of the IDEA and
Rehabilitation Act, 29 U.S.C. § 794(a).  While the IDEA is
phrased in terms of a state's affirmative duty to provide a free,
appropriate public education, the Rehabilitation Act is worded as
a negative prohibition against disability discrimination in
federally funded programs.  Case law indicates that entities, but
not individuals, may be liable under the anti-discrimination

provision of § 504 (29 U.S.C. § 794(a)) alone.  See Calloway, 89
F. Supp. 2d at 557.  Individuals acting under color of state law,
however, may be held liable under 42 U.S.C. § 1983 for
infringements of rights under § 504.  See, e.g., W.B. v. Matula,
67 F.3d 484 (3d Cir. 1995).  Here, however, Raymond Sherman has
been sued in his official, not individual capacity, and, as
discussed above, having failed to establish the existence of an
official policy and Sherman's role as a policymaker, § 1983
liability against Deptford and Sherman cannot be maintained.
Thus, only Deptford may be potentially liable under § 504 itself.

        To establish a violation of the anti-discrimination
provisions of § 504, the plaintiff must demonstrate that (1)
plaintiff is disabled as defined by the Act; (2) plaintiff is
"otherwise qualified" to participate in school activities; (3)
the school or the Board receives federal financial assistance;
and (4) plaintiff was excluded from participation in, denied the
benefits of, or subject to discrimination at, the school.
Nathanson v. Medical College of Pennsylvania, 926 F.2d 1368, 1380
(3d Cir. 1991).  In addition, to be liable, defendants "must know
or be reasonably expected to know of" plaintiff's disability.
Id. at 1381.  However, the plaintiff "need not establish that
there has been an intent to discriminate in order to prevail
under § 504."  Id. at 1384; see Alexander v. Choate, 469 U.S.
287, 297 (1985).

Deptford correctly argues that a claim under the Rehabilitation Act cannot stand because Defendants are unable to show that H.B. was denied equal treatment, or was discriminated against, because of her handicap.  Defendants make no reference to any other students on which to base a finding of unequal treatment.

Defendants, however, maintain that their Rehabilitation Act allegations are brought in the context of a retaliation claim, rather than an alleged violation of the anti-discrimination prohibition contained in § 504.  "It is evident from the language of the relevant regulation that individual actors can be liable for retaliation under § 504.  34 C.F.R. § 100.7 provides that no recipient 'or other person' may engage in retaliatory activity."  P.N. v. Greco, 282 F. Supp. 2d 221, 242 (D.N.J. 2003).  Thus, both Deptford and Sherman may be liable for retaliation under § 504.[6]  Moreover, to establish a retaliation claim under § 504, the claimant must establish that "(I) a plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity

_____

[6]Although Deptford and Sherman may be liable for retaliation under § 504 directly, for the same reasons as previously articulated, Defendants' cannot maintain those counterclaims brought pursuant to § 1983.

29

and the adverse action." <u>Weixel v. Board of Educ. of City of New
York</u>, 287 F.3d 138, 148 (2d Cir. 2002).

Defendants have not presented sufficient evidence to survive
the motion for summary judgment on their § 504 retaliation claim.
The Court notes that it is apparent from the record that the B.
family engaged in protected activity for the purposes of § 504,
including advocacy for H.B. along with requests for
accommodations of H.B.'s disability.  <u>See</u>, <u>e.g.</u>, <u>Weixel</u>, 287 F.3d
at 149.  In addition, Deptford was clearly aware of this
protected activity, thus satisfying the second required showing
for such a claim.  Moreover, sufficient evidence in the record
exists of adverse actions taken against the B. family, namely
Deptford and Sherman's conduct in allegedly ignoring the Orders
of the ALJ and this Court (prohibiting occupational therapy,
compensatory education for speech and occupational therapy;
failing to fund discreet trial therapy; failing to reimburse
H.B.'s parents for their unilateral placement and other services,
etc.).  Where this claim fails, however, is in Defendants'
inability to marshal evidence as to the final requisite showing.
Indeed, the B. family has offered nothing to demonstrate that
what Deptford did rises to the level of retaliation.  Unlike the
allegations in <u>Weixel</u>, the primary case upon which Defendants
rely, which included the school district's threatening of the
plaintiff's parents for their exercise of these rights, refusing

to promote the plaintiff child to the next grade, and instituting child welfare investigations, Defendants' allegations simply do not support a cognizable retaliation claim.  See Weixel, 287 F.3d at 149.  The record evidence here does not give rise to any inference of the degree of antagonism between the B. family and officials within the Deptford Township School District necessary for a claim of retaliation; Deptford's actions, incorrect as they may have been, in ignoring the ALJ's Orders, amount to nothing more than a response to its disagreement with those Orders (as to which Deptford sought reversal and eventually a stay), and not acts of retaliation.  The evidence before this Court simply does not lend itself to the conclusion that Deptford was motivated by an intent or desire to punish Defendants for their advocacy on behalf of H.B.  Thus, Defendants' substantive Rehabilitation Act claim does not survive Plaintiff's motion for summary judgment and must be dismissed.

    4.   Compensatory Damages for the Parents' Loss

While the Third Circuit has ruled that damages are an available remedy under 42 U.S.C. § 1983 for violations of the IDEA, and directly under the Rehabilitation Act, it has also expressed a preference for compensatory education over compensatory damages.  See Matula, 67 F.3d at 495 ("We caution that in fashioning a remedy for an IDEA violation, a district court may wish to order educational services, such as

31

compensatory education . . . rather than compensatory damages for generalized pain and suffering.  However, we do not preclude the awarding of monetary damages and leave to the district court in the first instance the task of fashioning appropriate relief.").  In light of this guidance, this Court has already ordered Deptford to pay for services ALJ Futey ordered as well as expenses Defendants incurred in reasonable reliance thereon, even when such services were subsequently found by this Court not to be supported by the record before the ALJ.

The remaining damages sought by Defendants under the IDEA are the moving costs they claim were incurred when they were allegedly forced out of the Deptford School District on June 15, 2001, after the present case was filed, and required to relocate to Glassboro in order to obtain the necessary services for H.B., as a result of Deptford's alleged failure to comply with the ALJ's Orders prior to their move.[7]  Defendants contend that Deptford should bear responsibility for the additional expense they incurred in moving to Glassboro to obtain the education that Deptford was ordered to provide but did not.

Deptford responds that this is a claim brought on behalf of the parents themselves, not H.B., and is therefore not capable of

_____

[7]Since this Court had entered no orders prior to June 15, 2001, the subsequent conduct of Deptford toward this Court's Orders could not have caused the family's June 15 move to Glassboro as a matter of chronology and logic.

being asserted under the IDEA, relying primarily on Collinsgru v. Palmyra Board of Education, 161 F.3d 225 (3d Cir. 1998). In Collinsgru, the Collinsgru parents sought to represent their son, Francis, in a civil suit following a state administrative decision to deny their son special education services under the IDEA. This Court dismissed the suit after finding that non-attorney parents could not represent their children in a tort action in federal court. The Third Circuit affirmed and held that, in light of the IDEA's language and the statutory and common law rules guarding against non-attorney representation of another, parents seeking to enforce their child's substantive right to an appropriate education under the IDEA may not represent their child in federal court. Id. at 227. In so holding, the Third Circuit stated that "[b]ecause neither the statutory language nor the legislative history clearly implies that Congress intended parents to have joint rights with their children under the IDEA, we will not read joint rights into the Act." Id. at 235. From this, Deptford contends that the Third Circuit foreclosed the possibility of recovery of claims asserted by parents on their own behalf for alleged violations of the IDEA.

This Court agrees with Deptford that the Third Circuit's decision in Collinsgru did not announce that parents have rights under the IDEA, beyond the specific procedural rights provided in

33

the language of the statute.  See id. at 233 (stating that the
IDEA "clearly grants parents specific procedural rights, which
they may enforce in administrative proceedings, as well as in
federal court").  After first recognizing that the parents'
argument was analogous to asking the court to find that they
possess a private right of action under the IDEA, the Third
Circuit concluded that "the IDEA's language and legislative
history, as well as relevant case law and policy considerations,
suggest that Congress did not clearly intend to create joint
rights in parents under the IDEA."  Id. at 236.  The court
rejected the Collinsgrus' argument that "the right of parents to
control and financially support their child's education and the
rights of children to receive an education are so tightly
interwoven that the IDEA must necessarily protect both sets of
rights . . . ."  Id.

    However, even assuming that this Court is incorrect in its
interpretation of the holding of Collinsgru, whatever rights
H.B.'s parents may arguably have under the IDEA and which form
the alleged basis for their instant claim of entitlement to
reimbursement of moving expenses, H.B.'s parents have already
been adequately compensated for the monetary loss they incurred
in providing H.B. with educational services to which she was
entitled.  This Court has, on the issue of remedy, found it
appropriate for Deptford to reimburse H.B.'s parents for money

already spent on compensatory education, services which the
District was obligated to provide but did not.  The B. family has
not demonstrated, and this Court cannot foresee how Defendants
could demonstrate, that their decision to relocate to Glassboro
flows directly from the actions of Deptford.  The family's
independent decision to move from living quarters shared with a
relative to the family's own home, and the expenses incurred in
so doing, was not necessary to achieve the placement to which
H.B. was entitled under law, since the ALJ's decision and this
litigation itself afforded them the appropriate remedy.  In
moving to another school district, the B. family improved their
living situation and suffered no greater harm attributable to
Deptford beyond that for which they are already being
compensated.  An additional monetary award to H.B.'s parents
would serve only to punish Deptford, and such punitive measures
are improper, as the IDEA's primary purpose is to ensure a free
appropriate public education, not to serve as a tort-like
mechanism for compensating some sort of personal injury.  See
Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 125 (1st Cir. 2003).
This Court holds that H.B.'s parents have been compensated fully
in the fashion contemplated by the IDEA, and that no further
compensation for moving expenses is warranted where these parents
will have already received full funding for all compensatory

education of their child.  Thus, Deptford's request for an entry
of summary judgment on this claim will be granted.

     5.   <u>Pre-Judgment Interest</u>

     Defendants seek pre-judgment interest for the period of time
from which Deptford was ordered by ALJ Futey to provide certain
services to H.B. (and should have complied with that decision)
until the time payment was ultimately made on January 4, 2002 to
the B. family, reimbursing them for costs already incurred.

     An award of pre-judgment interest is in the sound discretion
of the trial court.  <u>Ambromovage v. United Mine Workers</u>, 726 F.2d
972, 981-82 (3d Cir. 1984).  "The purpose of an award of pre-
judgment interest is to compensate the plaintiffs for the
defendant's use of plaintiff's money after the cause of action
accrued but before judgment was entered."  <u>Clopp v. Atlantic
County</u>, 2002 WL 31242218, at *11 (D.N.J. Oct. 7, 2002).

     Deptford, citing to <u>Hudson County Chamber of Commerce v.
City of Jersey City</u>, 708 A.2d 690 (N.J. 1998), argues that
because it is a public entity, "'particular circumspection in the
granting of pre-judgment interest is required,' and 'a showing of
overriding and compelling equitable reasons' is essential to
justify the award."  <u>Id</u>. at 697 (quoting <u>Board of Educ. of City
of Newark v. Levitt</u>, 484 A.2d 723, 726 (N.J. Super. Ct. App. Div.
1984)).  Here, an argument for payment of interest may be made
based on Deptford's lack of due diligence in immediately

responding to the Order of ALJ Futey on December 6, 2000 and
failure to properly seek a stay while appealing that
determination in federal court.  On the other hand, pursuant to
this Court's Order, Defendants received on or about January 4,
2002 what turned out to be an overpayment for such services,
which is finally adjusted in the present Order, yielding only a
small net gain for Defendants.  The largest component of
Defendants' payment is for speech and occupational therapies not
rendered (as discussed at pp. 10-16, supra), and which have been
calculated at the current rate of $80 per hour rather than the
lower historical rate, which itself compensates for the time
delay.  The net undercompensation to Defendants has been computed
as $6,006.00, giving Defendants the benefit of the higher current
hourly rates, as discussed above.  In balancing Deptford's delay
in providing payment against the fact of Deptford's eventual
overcompensation under the interim Order on January 4, 2002 and
the fact of using the current rates for speech and occupational
therapy, the Court finds that the equities do not support an
award of prejudgment interest upon the net sum in order to make
Defendants whole.  No prejudgment interest, therefore, is due.
Deptford's motion for summary judgment with respect to this shall
therefore be granted.

6.   <u>FERPA Violation</u>

Among the claims advanced by Defendants in their counterclaim and third party complaint is a violation of the Family Educational Rights and Privacy Act of 1974, known commonly as FERPA.  The United States Supreme Court has ruled, however, that no private cause of action exists for a violation of FERPA. <u>See</u> <u>Gonzaga University v. Doe</u>, 536 U.S. 273, 276 (2002) ("We hold such an action foreclosed because the relevant provisions of FERPA create no personal rights to enforce under 42 U.S.C. § 1983").  In light of this precedent, Defendants have withdrawn their FERPA claim.

7.   <u>Constitutional Violations</u>

Defendants' equal protection and due process claims were brought against State Defendants which have previously been dismissed from this lawsuit.  Thus, Defendants agree these claims are not viable at this time and are therefore voluntarily dismissed.

38

### III.   CONCLUSION

For the reasons discussed above, the parties' motions for reconsideration will be granted in part and denied in part.  In addition, the motion of Deptford for summary judgment will be granted and Defendants' counterclaim shall be dismissed in its entirety.  The accompanying Order will be entered, concluding the adjudication of this case.


**June 15, 2005**                          **s/ Jerome B. Simandle**
DATE                                        JEROME B. SIMANDLE
                                            United States District Judge